UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| BECKY WHITE and SUSAN STRINGER, | Case No. 1:14-CV-00102-EJL-REB |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| TWIN FALLS COUNTY, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court in the above-titled matter is Defendant's Motion for Summary Judgment. (Dkt. 20.)   Plaintiffs have responded to the Motion, and Defendant has replied.   The matter is now ripe for the Court's review.   Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

**ORDER - 1**

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs were both employed by the Twin Falls County Sheriff's Office (TFSO), but they worked in different departments with different supervisors, co-workers and responsibilities.

### Plaintiff Becky White (White)

White worked as a Senior Specialist- Investigations and she was assigned to general Investigations, specializing in sex crimes. She had previously worked for the TFSO from July 2001 to May 2008 and then left to work in law enforcement in Utah. Ms. White was recruited to return to TFSO by Sheriff Tom Carter and Chief Deputy Geryln "Sam" Walker and started on March 16, 2009. White was terminated on February 10, 2012. The reason for her termination was based on alleged untruthful statements to her supervisor regarding her time cards for two pay periods. White denies her time cards were incorrect or that her statements were intentionally untruthful.

White maintains that the informal time reporting policy of the TFSO including the concept of "flex" time reporting was the reason she completed the contested time cards in the manner she thought was in compliance with the flex reporting approved by her supervisors in the past. White understood she was prevented from reporting her overtime because it was not approved in advance by her supervisor and she was told such overtime could not be approved based on the budget. White states she regularly worked more hours than she reported on her time cards in order to excel at her job.

**ORDER - 2**

White and former Chief Deputy Walker stated in their affidavits that male employees' time cards were not monitored or scrutinized by supervisors and male employees were allowed time off for personal matters while female employees were not allowed the same leniency on their time cards. White maintains she had very good performance reviews and her time cards were only reviewed after she wrote an email to Sheriff Carter indicating her interest in applying and/or testing for a sergeant's position in Investigations when a position came available. White was written up by her supervisor for not following the chain of command regarding her interest in a promotion. White also maintains her evaluation completed after notifying the Sheriff she was interested in seeking a promotion was her only evaluation that she received unsatisfactory ratings in certain areas. The supervisor indicated her unsatisfactory rating was related to a citizen's complaint where the supervisor determined the allegations in the complaint were unfounded. White maintains her evaluations before and after this one evaluation did not have any areas of unsatisfactory performance.

White also believes a complaint filed by Chief Deputy Walker with the IHRC which included White's name contributed to her time cards being targeted by her supervisor as a form of retaliation. White alleges she was the target of numerous harassing comments by Sheriff Carter such as, "How's the hot flash queen?"; "How's the menopause today?"; "Why do you have to be such a bitch?"; and "Do we need to get you laid?" It is undisputed that White did not file a complaint about the harassing comments, but instead tried to

**ORDER - 3**

ignore the comments and focus on her work. White also claims her training opportunities were more limited as compared to male employees.

The County maintains the time card incident with White was investigated by an independent officer from the Twin Falls Police Department who also found White had been untruthful. The County also argues the training records show White received necessary training opportunities to keep her certification. Therefore, the County maintains the there was a legitimate business reason for terminating White.

After White was terminated, she found work with the Rupert Sheriff's Office. White alleges the TFSO sought decertification of her law enforcement qualifications with Idaho Peace Officers Standards and Training ("POST") Council. The County maintains the TFSO did not request White's decertification. Instead Chief Deputy Newman states in his affidavit that a change in status form was completed for POST in the normal course and indicated White had been discharged for disciplinary reasons and that caused POST to make an inquiry as to the circumstances of the disciplinary action. A POST investigator conducted an independent investigation into the time card incident and determined that the time card incident did not warrant decertification of White's POST certification.

### Plaintiff Susan Stringer (Stringer)

Stringer began working for the TFSO in 1999 as a Detention Deputy. She was promoted to Detention Corporal, Detention Sergeant and then to Detention Staff Sergeant in 2004. Stringer maintains her performance evaluations were very good for the time she

**ORDER - 4**

worked for TFSO. In January of 2009, Stringer was demoted from Detention Staff Sergeant to Detention Sergeant due to an alleged reorganization of staffing at the Sheriff's Office. Stringer was told by Captain Hughes and Sheriff Carter that *all* Staff Sergeants were being eliminated and all other Staff Sergeants were also receiving the same demotion. Stringer accepted the demotion in rank and the reduction in hourly wage.

In February of 2011, Sheriff Carter announced the promotion of Dan Thom to Staff Sergeant. Stringer then discovered that a certain male Staff Sergeant had not been demoted in 2009 and all other Staff Sergeants in 2009 who were male had received promotions and or pay increases to newly created positions.

In August 2011, there was a new position for a Lieutenant of Operations in the jail. Stringer could not apply for the position as she had not received her Level III certificate even though all requirements were completed and the failure to receive the certificate was due to the male job training officer in the Sheriff's Office not completing Stringer's paperwork. Stringer did not receive her Level III certificate form POST until March 27, 2012. On October 7, 2011, Robert Hass was hired as the Detention Lieutenant position. Stringer maintains Hass had less experience and was not as qualified for the position as compared to her.

Stringer states based on these events she was encouraged to file a sex discrimination claim by her former supervisor. In December 2011 or January of 2012, Stringer filed a Complaint with the Idaho Human Rights Commission (IHRC)/Equal Employment Opportunity Commission (EEOC). The Complaint alleged sex discrimination regarding

**ORDER - 5**

Stringer's demotion. Attorneys for TFSO responded to the Complaint on February 9, 2012. The Complaint was deemed untimely by the IHRC because the Complaint was filed more than 300 days after Stringer's demotion which was effective February 2, 2009 even though the facts relating to the other Staff Sergeants was not discovered until 2011.

Stringer also claims requests for overtime or a female detention deputy were denied by her supervisor when requested by Stringer. Stringer maintains her shifts at the jail were regularly understaffed and with no female detention deputies on duty which required her to also fulfill the duties of a detention deputy which male sergeants did not have to do. Stringer claims she regularly worked overtime to complete her work, but she did not claim overtime on her timesheets as overtime was not approved by her supervisor.

On or about February 20, 2012, a Detention Deputy was threatened by one of the inmates. Stringer was not working on that day. On February 26, 2012, there was a window in a cell was broken out. The conditions in the jail were tense and possibly bordering on a riot when combined with the events on February 20th. Not all broken shards of glass could be accounted for, so Stringer, as the sergeant on duty, determined that a strip search of certain inmates was justified for security and safety reasons. The location of one of the strip searches was in a cell that included a video camera as the room normally used for strip searches was already occupied. It was TFSO policy not to record strip searches of inmates so Stringer instructed the Deputy to turn off the camera. Unfortunately, it is not possible to turn off the surveillance camera in the cell they were using. This matter was investigated by Stringer's supervisors and an independent investigator from the Ada County Sheriff's

**ORDER - 6**

Office. Stringer was suspended with pay during the investigation by Chief Deputy Don Newman on March 16, 2012.

The independent investigator recommended a written reprimand be placed in Stringer's file, but no formal discipline for the alleged failure to supervise properly. The investigator never interviewed Stringer about the events and or allowed her to explain why she believed exigent circumstances existed. The investigator also found that actions should have been taken on February 20th to reduce tensions. Even though Stringer was not the supervisor on February 20th, she was the only officer who was disciplined for the events. In addition to the written reprimand, Stringer was to receive additional training and she was placed on probationary status for one year. It is unclear from the record if the independent investigator recommended the probationary period or if that was determined by Stringer's supervisors. Stringer was advised of the written reprimand by Lt. Wiggins and Captain Hughes on March 27, 2012. She was also advised by a letter from Chief Deputy Newman that she should return to work on her next scheduled shift.

The stress of the investigation, the lack of support by her supervisors as well as general sex discrimination Stringer felt she was experiencing at work caused Stringer to become depressed and have suicidal thoughts. She went to Dr. Mary Beth Curtis on March 29, 2012, who diagnosed Stringer with acute depression and suicidal thoughts. Dr. Curtis referred Stringer to the emergency room for further evaluation to make sure she was not a danger to herself or others. She also referred Stringer to a counselor. Dr. Curtis wrote a letter dated March 29, 2012 that was provided to the Human Resources Director of Twin

**ORDER - 7**

Falls County, Elaine Molignoni, indicating that for medical reasons Stringer needed to take some time off work and the doctor anticipated Stringer could return to work around the middle of April. Dkt. 26-2, Ex. 39.

Based on the March 27, 2012 letter from Dr. Curtis, TFSO started the clock under the Family Medical Leave Act (FMLA) for up to 12 weeks of leave for Stringer. Stringer had accumulated vacation and sick leave hours. Under the Twin Falls County policy, an employee is required to use available vacation and sick leave time prior to taking unpaid leave. Dkt. 26-2, Ex. 51, 10-7. Family and Medical Leave. Section 10-7- 1 provides:

> County employees are required to use accrued paid vacation and sick leave first. If the accruals are less than 12 weeks, the employee may take the rest as unpaid leave. Employees will continue to accrue vacation and sick leave while utilizing their vacation and sick leave. However, they will cease to accrue vacation and sick leave during the unpaid portion of their leave.

On June 19, 2012, Stringer advised Captain Hughes she would no longer be turning in any timesheets as she had no paid time off left of her accrued vacation and sick leave. Dkt. 26-2, Ex. 48.

On June 19, 2012, Captain Hughes advised Stringer by email and copied in Molignoni, that Stringer that her FMLA would expire on June 21, 2012 and the TFSO expected her back at work on June 22, 2012. Dkt. 26-2, Ex. 49. Captain Hughes asked for Stringer to call himself or Molignoni and advise one of them of her intent to return to work and to bring a doctor's note indicating she was fit to return to work. *Id.* Stringer maintains she had numerous conversations with Molignoni regarding her medical status, how she did

**ORDER - 8**

not feel she could return to the jail due to the work environment and that she would like to return to work with the County in another position other than the jail.

It is unclear the date Stringer contacted Captain Hughes or Molignoni, however, on June 25, 2012, there is an email from Stringer to Molignoni asking if she had received the note from her doctor and what her options were. Dkt. 26-2, Ex. 50. Molignoni responded she had received the doctor's note, Stringer's job protected leave was exhausted, she needed more information regarding Stringer's condition, approximate return date, and any work restrictions would help the county's decision regarding Stringer's employment. *Id.* Molignoni never asked Stringer to sign a medical release authorization so she could speak with her doctor regarding her medical condition. The doctor's note of June 21, 2012 states: "For medical reasons, please excuse the above named employee from work for the following dates:   Start: 6/21/2012   End: indeterminate. If you need additional information feel free to contact our office." The note was signed by a nurse practitioner for St. Lukes. Dkt. 20-26, Ex. B.

It is unclear from the record whether Stringer did or did not provide any further information regarding her medical condition to the County beyond the above referenced note before Stringer was called to the office on July 2, 2012 to meet with Captain Hughes. Captain Hughes informed Stringer she was being terminated and handed her an undated letter from Sheriff Carter that indicated on June 21, 2012 Stringer submitted a doctor's note indicating Stringer needed additional time off for an "indeterminate" amount of time and

**ORDER - 9**

that Stringer had not contacted anyone since June 21, 2012, so she was being terminated effective July 3, 2012. Dkt. 26-2, Ex. 52.

Stringer states in her affidavit that she asked Molignoni for an accommodation to work due to the fact her she could not emotionally handle returning to the work conditions in the jail and the lack of support on the part of her supervisors after the investigation in March. Affidavit of Susan Stringer, Dkt. 26, ¶ 59. Stringer indicates she believed she was ready to return to work as long as she was not assigned to the jail. *Id.* at ¶ 58. Stinger does not believe she is totally disabled. Plaintiffs' Response to Defendant's Statements of Facts, Dkt. 30, ¶ 36. Stringer made it known to Molignoni she was willing to work in another job for the county such as the Department of Motor Vehicles (DMV), patrol or court services and was requesting such an accommodation. Stringer believed when she was called in to meet on July 2nd, the purpose was to discuss other possible jobs, not to be terminated. Stringer also believed in July that she had still had time remaining under the FMLA (as she did not think the 12 weeks of protected leave started until after she had exhausted her vacation and sick leave).

Molignoni had no recollection of Stringer asking for an accommodation under the ADA. Molignoni claims at no time did Stringer advise her that she had a disability or any medical condition sufficient to warrant as a disability. Molignoni does not deny Stringer advised her of the stresses of working in the jail. Whether or not Stringer disclosed the acute depression she was suffering to Molignoni is unclear from the record. Molignoni testified she never asked Stringer for a medical release from Stringer to obtain additional

**ORDER - 10**

medical information. Molignoni stated she called the doctor's office, but the office would not provide any information to her without a release. Molignoni is aware as a Human Resources specialist that one cannot obtain medical records of another person without authorization.

Both White and Stringer claim they suffered sex discrimination, sexual harassment at the workplace and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.; 42 U.S.C. 1981(a) et seq. White an Stringer filed complaints with the IHRC and EEOC before proceeding with their lawsuit.

White believes after she was listed as a witness in the IHRC complaint filed by Walker, retaliation occurred in not considering her for a promotion, writing her up for a chain of command violation when she emailed the Sheriff about a promotion she would like to be considered for, and having her timesheets scrutinized unlike other male officers.

Stringer claims she was discriminated against based on her sex when she was demoted while other sergeants were promoted. Stringer claims she suffered retaliation for filing a complaint with the IHRC as it was shortly after she filed that she was placed on leave for the February jail incident, not allowed to give her view of the incident during the investigation and she was the only person who suffered an adverse employment action (being suspended and then placed on probationary status for one year) because of the events in February at the jail. Stringer also claims the County did not comply with the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), by failing to accommodate her request to return to a position other than at the jail.

**ORDER - 11**

On March 13, 2014, Plaintiffs filed their Complaint alleging violations for sex discrimination, hostile work environment, retaliation, the ADA for Stringer, the Age Discrimination Employment Act (ADEA) for White, the Fair Labor Standards Act (FLSA) for failure to pay for overtime, as well as negligent and intentional infliction of emotional distress. Defendant denies all allegations and moves for summary judgment on all claims.

## STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The moving party moving bears the initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).   Where, as here, the movant does not bear the burden of proof at trial, it must show "an absence of evidence to support the nonmoving party's case."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The burden then shifts to the nonmoving party to show a genuine dispute of fact. *Anderson*, 477 U.S. at 256-57.   The nonmoving party may not rest upon mere allegations or denials in its pleading and must produce evidence sufficient to show that a reasonable jury could return a verdict in its favor.   *Id*. at 248.   In order to withstand a motion for summary judgment, the nonmoving party:

ORDER - 12

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989) (citation omitted).

On motion for summary judgment, the Court does not weigh evidence or determine truthfulness of allegations; instead, it determines the existence of genuine issues of material fact. *Cornwell v. Electra Cnt. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006). An issue of material fact is one which may affect the outcome of the case. *Anderson,* 477 U.S. at 248.   The Court must view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 255.   Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).   A statement in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

**ORDER - 13**

# ANALYSIS

## Hostile Work Environment

The Court finds certain claims have been conceded by Plaintiffs and will address those claims first. Both employees also acknowledge they were trained and aware of the TFSO's policies for the reporting sexual discrimination or harassment. Both employees admit they did not file complaints with their supervisors or the county's human resources department. Therefore, Plaintiffs agree their claims for a hostile work environment should be dismissed as the employer cannot be liable under *Faragher v. City of Boca Raton*, 524 U.S. 775, 806-07 (1998). The Court agrees and while the facts alleged regarding the work environment are troubling, the Plaintiffs' claims for a hostile work environment must be dismissed as a matter of law.

Although Plaintiffs have conceded their claims regarding a hostile work environment should be dismissed as they never first filed complaints with their employer, Plaintiffs seek to have the Court take note of the work environment in determining whether the reasons certain employment actions were taken were pretext for the real reason of sex discrimination. The Court agrees such facts may be considered in evaluating the discrimination and retaliation claims. Additionally, in viewing the facts in a light most favorable to Plaintiffs, the Court will also consider the demotion of Chief Deputy Walker for non-disciplinary reasons in 2010, her resignation from the Sheriff's Office in 2011, and her knowledge of the practices followed in the TFSO up until the time of her resignation as relevant admissible evidence regarding the employment practices of the TFSO.

**ORDER - 14**

**White's Age Discrimination Claim**

Plaintiff White also concedes in the responsive briefing that her claim for age discrimination should be dismissed. The Court agrees as White has failed to allege she was replaced by a substantially younger employee with equal or inferior qualifications. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

**Negligent and Intentional Infliction of Emotional Distress Claims**

As to the claims for negligent and intentional emotional distress, Defendant argues in its reply brief these claims have been conceded by Plaintiffs. The Court finds Plaintiffs have not conceded these claims in their briefing. Instead, Plaintiffs asks that a jury determine if the conduct of the TFSO meets the statutory requirements for a negligent or intentional claim for emotional distress.     The elements of a claim for intentional infliction of emotional distress are as follows: "1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." *See, e.g. Mortensen v. Stewart Title Guar. Co.,* 235 P.3d 387, 396 (Idaho 2010).   The Court agrees with Defendant that Plaintiffs have failed to allege facts that would allow a reasonable juror to find the alleged conduct at issue in this case rises to the level of "extreme and outrageous." Moreover, Plaintiff White has failed to present evidence of a causal connection between the wrongful conduct and the emotional distress or that her distress was severe. As to Stringer, there are facts to support that

**ORDER - 15**

communications were unclear between Molignoni and Stringer on her ADA claim, but there has been no showing the conduct was intentional or reckless on the part of Molignoni or other TFSO employees. While Stringer did suffer from emotional distress that caused her to take an extended period of leave from work under FMLA, there is no evidence that the alleged conduct of discrimination or retaliation was intentional or reckless by her supervisors. The Court will dismiss this claim as to both defendants.

"The elements of a claim for negligent infliction of emotional distress are the same as for any common law negligence tort: 'a duty recognized by law requiring the defendant to conform to a certain standard of conduct, a breach of that duty; a causal connection between the conduct and the plaintiff's injury, loss or damage. In addition, the Plaintiff must demonstrate some physical manifestation of the emotional distress.' *See, e.g. Johnson v. McPhee,* 466, 210 P.3d 56, 574 (Idaho Ct.App.2009)." *Feltmann v. Petco Animal Supplies, Inc.*, 2012 WL 1189913, *5 (D. Idaho March 20, 2012). In *Feltmann*, the Court determined under Idaho law there is no common law duty to keep a workplace free from emotional distress. *Id.*   This Court agrees that under Idaho law, a claim for negligent infliction of emotional cannot lie in the employment context and the Plaintiffs' claims must be dismissed.

**Discrimination Claim**

Title VII of the Civil   Rights Act provides that it is unlawful for an employer to "discharge…or otherwise to discriminate against any individual with respect to his [or her]

**ORDER - 16**

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, sex, or national origin."   42 U.S.C. §2000e-2(a)(1).   The term

"because of…sex" includes pregnancy, childbirth or related medical conditions, and

pregnant women should be "treated the same for all employment-related purposes…as

other persons not so affected but similar in their ability or inability to work."   42 U.S.C.

§2000e(k). Thus, the Court reviews the instant discrimination claim as claim for sex

discrimination under Title VII.

Title VII discrimination claims are reviewed using the burden-shifting framework

of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   Under this framework, the

plaintiff must first establish a prima facie case of sex discrimination.   *Nicholson v.*

*Hyannis Air Service, Inc.*, 580 F.3d 1116, 1123 (9th Cir. 2009).   If a prima facie case

exists, then the burden of production, but not persuasion, shifts to the employer to articulate

a legitimate, nondiscriminatory reason for the challenged action.   *Chuang v. Univ. of Cal.*

*Davis, Bd. Of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the employer meets its

burden, the plaintiff must then raise a triable issue of material fact as to whether the

employer's proffered reasons are pretext. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th

Cir. 2007). To satisfy the burden for pretext, the plaintiff must "produce enough evidence

to allow a reasonable factfinder to conclude either: (a) that the alleged reason for the

discharge was false or (b) that the true reason for [his] discharge was a discriminatory one."

*Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996).

**ORDER - 17**

To establish a prima facie case of sex discrimination, plaintiff must show: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside the protected class were treated more favorably.   *Nicholson*, 580 F.3d at 1123.   Discrimination plaintiffs need to produce "very little evidence" to oppose to a summary judgment motion. *Chuang*, 225 F.3d at 1124.   The elements and contours of a prima facie case will differ according to the facts at hand.   *Hawn v. Executive Jet Management, Inc.*, 615 F. 3d 1151, 1156 (9th Cir. 2010).   A plaintiff can use direct or circumstantial evidence to establish a prima facie case for discrimination.   *Id.*

The Court finds it makes the most sense to analyze the claims of each Plaintiff separately since the factual scenarios for each employee's termination differ significantly.

**Plaintiff Becky White**

It is undisputed that White was a member of a protected class, she was qualified for her position, and she suffered an adverse employment action in that she was terminated. The contested issue before this Court in the motion for summary judgment is were similarly situated individuals outside the protected class treated more favorably. To establish the final element under *McDonnell Douglas*, plaintiffs must produce evidence that similarly situated male were treated more favorably. Employees are similarly situated when they have similar jobs and display similar conduct. *Nicholson*, 580 F.3d at 1125. They need not be identical but must be similar in all material respects. *Id.*

**ORDER - 18**

In the case at bar, White has created a genuine issue of material fact regarding the treatment of time cards for male employees versus for female employees. Her testimony as well as the testimony of Walker create a genuine issue of material fact as to whether male employees' time cards were reviewed under the same standard as her time cards. It appears undisputed that White's supervisors knew she was a hardworking employee that put in extra hours of work that were not claimed based on the TFSO policy of not approving overtime compensation due to budget constraints. Further, there is no allegation that White had not worked the total hours of work she claimed on her time cards.

The Court agrees it is disputed as to whether White did not receive equal training opportunities. The record established White received necessary training to maintain her certification and there may have been legitimate reasons why other officers were selected for training over White on certain occasions.

While the Court is mindful of TFSO's argument White was fired for being untruthful on her timecard, there is evidence to suggest that male employees' time cards were not reviewed for truthfulness and male employees were allowed to take time off for activities, but female employees were not allowed time off. Whether the review of White's time card, the manner in which it was investigated and her termination as compared to similarly situated male employees was discriminatory based on her sex is an issue for the fact finder in this case, but for purposes of the summary judgment motion, the Court finds White has established a prima facie case of discrimination.

TFSO responds that there was a legitimate reason for the termination and that the time card incident was independently reviewed to ensure that the decision to terminate was not in any way discriminatory. The Court respectfully disagrees that having an independent agency conduct the investigation is by definition a legitimate business reason for whatever action is taken. All the circumstances must be considered. the Court finds that White has put at issue whether the initial investigation was conducted in accordance with TFSO policies and whether the initial investigation was based on her gender, was retaliation for being named in the IHRC complaint filed by Walker, for being written up for failing to follow the chain of command in showing interest for a promotion, etc.

White has "produce[d] enough evidence to allow a reasonable factfinder to conclude *either*: (a) that the alleged reason for the discharge was false or (b) that the true reason for [her] discharge was a discriminatory one." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996). This claim must therefore be decided by a jury.

**Plaintiff Susan Stringer**

It is undisputed that Stringer was a member of a protected class, she was qualified for her position, and she suffered an adverse employment action in that she was demoted, denied promotions, put on probationary status for a year and ultimately terminated. The contested issue before this Court in the motion for summary judgment is were similarly situated individuals outside the protected class treated more favorably. The Court also finds Stringer has presented a prima facie case for sex discrimination in promotions

(demotion from staff sergeant to sergeant while male staff sergeants were not demoted and were promoted), pay differences due to promotions when others had less experience, work scheduling (male sergeants had regular day shifts, Stringer had less regular shift assignments), detention work duties as compared to male detention sergeants (she had to perform duties of a female detention officer while also being a sergeant while male sergeants were allowed female detentions officers on their shifts), denial of her opportunity to provide her perspective during the investigation of the February 2012 incident while other officers were interviewed and the denial of requests for a position outside the jail after she was out on FMLA leave.

Stringer's performance reviews (except for the February 2012 incident) all indicate she is fulfills her job duties professionally and proficiently. While Defendant counters that an independent investigation found Stringer should receive a written reprimand for the February incident, there is sufficient evidence to support that the reprimand coupled with the probationary status for one year could be a form of sex discrimination.

Defendant argues the independent agency investigation establishes there was a legitimate reason for the reprimand, but there are genuine issues of fact whether the recommended written reprimand with training also included a recommendation of probation, whether the lack of inclusion of Stringer's viewpoint in the investigation was discriminatory, whether the decision to analyze this event later in March was in some way impacted by her prior requests for more female detention assistance, the denial of overtime requests to properly investigate the incident, and her recent IHRC complaint.

**ORDER - 21**

Stringer has produced enough evidence to allow a reasonable factfinder to conclude *either*: (a) that the alleged reason for the lack of promotion (demotion of only female sergeants) or probationary period was false or (b) that the true reason for her lack of promotion or probationary period was a discriminatory one. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996). Because genuine issues of material fact exist, this claim must be decided by a jury.

**Retaliation Claim**

Title VII includes a separate anti-retaliation provision that prohibits an employer from discriminating "against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge…under this subchapter."   42 U.S.C. §2000e-3(a).   Title VII retaliation claims also follow the *McDonnell Douglas* burden-shifting framework.   *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).   To establish a prima facie case of retaliation, each plaintiff must demonstrate: (1) she engaged in a protected activity; (2) she was subsequently subject to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).

The anti-retaliation provision seeks to prevent harm to individuals based on their conduct.   *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).   That harm is not limited to so-called "ultimate employment decisions," but is one a reasonable

enter

employee would find materially adverse and which might dissuade a reasonable worker from making or supporting a charge of discrimination.   *Id.* at 67-68.   The significance of any given act of retaliation will often depend on the circumstances.   *Id.* at 69.

The Ninth Circuit takes an expansive view of the type of action that constitutes an adverse employment action.   *Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 850 (9th Cir. 2004).   An adverse action is one that is "reasonably likely to deter employees from engaging in protected activity."   *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). Probationary status for a year definitely meets the

To show causation, a plaintiff must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."   *University of Texas Southwestern Medical Ctr.*, 133 S.Ct. at 2534.   Under this heightened standard, the plaintiff must prove that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." [1]   *Id.* at 2533.

Causation sufficient to establish a prima facie case may be inferred from circumstantial evidence, such as the "employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the

---

[1] Prior to *Nassar*, the Ninth Circuit invoked the broader motivating-factor test Ms. Kaiser relies upon.   The Ninth Circuit held that temporal proximity could be used to support an inference of retaliatory intent sufficient to survive summary judgment.   *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008).   The Ninth Circuit has not yet applied the but-for causation standard in a retaliation case but has noted that it is the proper standard.   *See Avila v. Los Angeles Police Dept.*, 758 F.3d 1096, 1101 n.3 (9th Cir. 2014) (noting that the but-for causation standard is now required but declining to address a causation question not before the court); *Rose v. Plastikon Indus., Inc.*,   537 Fed.Appx. 750, 751 n.1 (9th Cir. 2013) (noting that "the proper causation test for Title VII retaliation claims is "but-for causation" rather than motivating-factor causation).

allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

As to White, the Court finds using direct and circumstantial evidence Plaintiff has established a prima facia case to allow her retaliation claim to proceed. Gerlyn Walker warned White that Chief Deputy Newman arguably had it out for her. Based on her evaluations by her supervisors prior to her termination, it is at least possible for a fact finder to find that being listed as a witness in Walker's IHRC as well as seeking to inform the Sheriff of her interest in a promotion (she had arguably been told she would be considered for in the past) are protected activities that subsequently led to her time cards being scrutinized and led to her termination. The Sheriff and Chief Deputy Newman had knowledge that White engaged in protected activities and proximity in time between her protected action and termination are sufficient to put at issue for purposes of this motion the causation required.

As to Stringer, her prima facie case for a retaliation claim is even more obvious. An employee's submission of or support for a complaint that alleges employment discrimination is a type of protected activity covered by Title VII, §2000e-3(a). *University of Texas Southwestern Medical Ctr. v. Nassar*, ---- U.S. ----, 133 S.Ct. 2517, 2525 (2013). Here Stringer submitted her IHRC/EEOC claim regarding failing to be promoted like other male sergeants in December 2011 or January of 2012, her requests for overtime and a female detention deputy were denied. She was the only officer written up for February 2012 incidents, she was not only given a written reprimand but was placed on

**ORDER - 24**

probationary status for a year. Stringer also maintains her use of FLMA leave and ADA claim also are protected activities that were used against her and ultimately resulted in her termination instead of working with her to find another position outside the jail. Causation can be inferred from the proximity of the protected activity and the adverse employment action of lack of promotions/her demotion, the probationary period and her ultimate termination when she was left the impression the Human Resources specialist was trying to figure out another position with the County.

Once Plaintiffs have established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action. *Chuang*, 225 F.3d at 1123-24.   Here, TFSO argues again it had independent investigations of the basis for White's termination and Stringer's written reprimand with probation for a year so there was a legitimate, non-retaliatory reason for its actions. If an employer offers a legitimate, non-retaliatory reason for its action, a plaintiff must then raise a triable issue of material fact as to whether the employer's proffered reasons are pretext.   *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

Using indirect evidence, a plaintiff can prove pretext by showing that the employer's proffered explanation is "unworthy of credence."   *Chuang*, 225 F.3d at 1127. A plaintiff can rely on the same evidence used to establish a prima facie case of retaliation to show pretext if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons.   *Id*.   A retaliation plaintiff is required to produce "very

**ORDER - 25**

little" direct evidence of the employer's discriminatory intent to move past summary judgment.  *Id.* at 1128.

In the case at bar, the Court finds Plaintiffs have presented evidence of specific circumstances existing at the time of White's termination and Stringer's reprimand and/or termination that a fact finder could find show TFSO's retaliatory intent was the real reason for the adverse actions. For these reasons, the retaliation claims will also survive summary judgment.

### Stringer's FMLA Claim

Stringer also claims in the briefing that the County fired her before her FMLA had expired. The Court finds this claim must be dismissed as a matter of law as the County has set forth its FMLA policy which is consistent with the leave requirements of the FMLA. 29 U.S.C. § 2612. An employer may require that an employee use up all accrued vacation and sick leave prior to taking unpaid leave under the FMLA. 29 U.S. C. § 2612(d)(2)(A). The using up of accrued vacation and sick leave does *not* extend the starting date of the leave calculation under the FMLA. Rather, it merely allows an employee to be paid for a portion of the leave before the unpaid portion of the leave applies. This is to prevent an employer from having to grant more than 12 weeks of protected leave under the FMLA for an employee who has banked vacation or sick leave. It also works to the benefit of the

**ORDER - 26**

employee as such employee is paid for the FMLA time off work as well as having their job protected.

Stringer and her doctor completed the necessary FMLA paperwork, Dkt. 20-26, p. 18-22, p. 26. The paperwork sets forth that on March 29, 2012, Stringer informed Molignoni she was requesting leave begin on March 29, 2012. The paperwork also indicates that the county was requiring the employee to substitute or use paid leave during the FMLA leave. Dkt. 20-26, p. 18. This is consistent with the County's policy 10-7-1 which states employees are "required" to use accrued vacation and sick leave first. Dkt. 26-2, p.48. The County approved the FMLA request on April 18, 2012.

The FMLA provides for 12 weeks (or 84 days) of job-protected leave. Here, Stringer took 3 days in March, 30 days in April, 31 days in May and 20 days in June before her FMLA leave expired. Her supervisor correctly informed her that her FMLA leave expired on June 21, 2012. Dkt. 26-2, p.46.

Plaintiff Stringer is mistaken as to "how" vacation and sick leave is applied, but it appears that the County properly calculated the FMLA leave. Stringer's use of accrued paid leave does not extend the 12 week job protection of the FMLA and this claim must be dismissed.

**ORDER - 27**

**Stringer's ADA Claim**

Stringer claims the County failed to comply with the ADA by failing to engage in an interactive process in good faith. Defendant disagrees that Stringer ever requested accommodation and contests that Stringer has is a qualified individual with a disability.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability. . . ."   42 USC § 12112(a). "To prevail on a claim of unlawful discharge under the ADA, the plaintiff must establish he [she] is a qualified individual with a disability and that the employer terminated him [her] because of his disability."   *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).   "The ADA defines a 'qualified individual with a disability' as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).   "An ADA plaintiff bears the burden of proving she is a qualified individual with a disability."   *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1108 (9th cir. 2000) (internal quotation marks omitted). A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(a).

> Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. *Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir.2000). "An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position." *Id.* at 1115. The interactive process requires communication and good-faith exploration of

> possible accommodations between employers and individual employees, and neither side can delay or obstruct the process. *Id.* at 1114 -15; *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."). Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible. *Barnett*, 228 F.3d at 1116.

*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137-38 (9th Cir. 2001).   The duty to accommodate is a continuing duty. *Id.* at 1138.

Stringer submitted three medical provider notes to the County. The first note was dated March 29, 2012 and indicated she needed be off work for medical reasons with an anticipated return the middle of April. Dkt. 26-2, p.31. Stringer submitted a second doctor's note dated April 18, 2012, which indicated "For Medical reasons, please excuse the above named employee from work for the following dates:   Start: 6/21/12    End: open."   Dkt. 20-26, p.17. The third doctor's note was dated June 21, 2012 and states "For Medical reasons, please excuse the above named employee from work for the following dates:   Start: 4/17/12    End: indeterminate." Dkt. 20-26, p.12.

It is unclear from the affidavits and deposition testimony exactly how much information Stringer shared with Molignoni regarding the details of her medical condition. While Molignoni never requested a release be executed for medical records, she did request in her email of June 25, 2012, more information about her condition and when Stringer could be expected to return to work. Dkt. 26-2, p.47. It appears Stringer did not provide any more information prior to being terminated on July2, 2012.

**ORDER - 29**

Clearly, there are genuine issues of material fact regarding whether Stinger suffers from a disability as defined by the ADA. Plaintiff is correct that major depression and anxiety accompanied by suicidal ideation requiring FMLA leave may qualify as a disability under the ADA. *See Kinney v. Century Servs. Corp. II*, 2011WL 3476569 (S.D. Ind. Aug. 9, 2011) (episodic depression constitutes disability). Here, it is unclear if Plaintiff was maintaining that in June she was still suffering from severe depression and was still have suicidal thoughts. On the medical certification form submitted with the FMLA request in April, Stringer's medical provider stated she "question[s] whether the environment at work is safe for this patient."   Dkt. 20-26, p.21.

Stringer argues in her briefing that she was able to perform the essential functions of her job in June but was requesting an assignment different than the jail arguably for mental health reasons. Stringer states in her affidavit she did request accommodation from Molignoni. Molignoni says Stringer never asked for accommodation or stated she suffered from a disability or was invoking the ADA and seeking an accommodation.

It appears from the record presented that there was a misunderstanding about how Stringer's request to work in another area was being evaluated. In Molignoni's notes regarding an in-person meeting with Stringer on June 20, 2012, Dkt. 20-26, p.8, she states Stringer told her she was not sure when she could return to work as her doctor was adjusting her medication. The notes also indicate Stringer stated she intended to come back to work and she wanted to know her options. *Id.* When Molignoni received the June 21, 2011 doctor's note, she responded in an email that she was working with the Sheriff's

Office regarding our options. Dkt. 26-2, p. 47. In viewing the June 25, 2012 email in a light

most favorable to Stringer, her belief is understandable that she thought Molignoni was

working on finding another position for her to return to besides the jail.

For these reasons, the Court finds genuine issues of material fact exist regarding

whether Stringer met the definition of a qualified individual with a disability on June 21,

2012, whether a request for accommodation was made (even if the word "accommodation"

was not formally used – was Molignoni aware of a potential medical condition Stringer had

that could have made her eligible for relief under the ADA), if yes, did the County engage

in the interactive accommodation process in good faith to determine if Stringer still

suffered from a disability and what reasonable accommodation would be, if she did return

was there another job outside the jail that was available, could Stringer have come back to

the jail if her shifts were changed, her duties were modified, etc.   The record before this

Court does not allow the Court to determine whether a violation of the ADA occurred in

this particular case and summary judgment on this claim must be denied.


**Plaintiffs' FLSA Claims**

Plaintiffs both allege claims under the Fair Labor Standards Act, 29 USC § 201 et

seq., for overtime they worked but were not paid for. Defendants move to dismiss arguing

Plaintiffs have failed to present evidence of actual hours of overtime worked, claimed and

not paid. Plaintiffs respond they do not have to produce the evidence at this time.


**ORDER - 31**

The record is clear that the TFSO's policy did not allow for overtime unless such had been approved in advance by supervisors. Supervisors told employees requesting overtime that such was not generally available due to budget constraints and the employee should figure out another way to complete their work, such as delegating duties, etc. Both White and Stringer admit they worked more than they reported on their time sheets, but did not claim any overtime and after a certain point stopped requesting overtime as supervisors would not approve overtime. Neither White nor Stringer have submitted records of the overtime hours they specifically worked but did not claim.

Plaintiffs carry the burden of proving as a matter of just and reasonable inference that he or she performed work for an employer and was not properly compensated. *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998). The statute of limitations is two years for FLSA claims for overtime, so any overtime at issue needed to have been worked after March 13, 2012.   29 U. S. C. § 255(a). By March 13, 2012, White had been terminated and Stringer was on paid leave pending investigation of the February 2012 incident as of March 27, 2012. So the only time period where overtime could have been worked and be within the statute of limitations is between March 13, 2012 and March 27, 2012. Stringer had already investigated the February incident by that time and makes no factual allegations she worked overtime during those two weeks for which she was not compensated.

The Court notes the statute of limitations can be extended to three years if the employee can show a willful violation by the employer.   29 U.S.C. § 255(a).   Plaintiffs

have not submitted evidence with specific dates and details to carry their burden the failure to pay overtime was willful. Plaintiffs admit they never put the overtime down on their time sheets so it is difficult to find an employer acted willfully when it never took action to deny the claimed overtime.

While the record establishes there is a real possibility that supervisors in the TFSO had reason to know that employees (including but not limited to White and Stringer) were working overtime and not claiming overtime based on the timesheet policies of the TFSO and the policy of denying approval of overtime in advance by supervisors due to budgetary constraints, Plaintiffs have not carried their burden as to actual overtime hours worked but were not paid that are within the applicable statute of limitations period and the FLSA claims must be dismissed as a matter of law.

## CONCLUSION

The Court finds genuine issues of material fact exist to allow the sex discrimination, retaliation and ADA claims to proceed to trial. The other claims must be dismissed as a matter of law. Furthermore, now that the Court has narrowed the issues for trial, it may be productive and in the best interests of all parties to engage in a settlement conference or some other form of alternative dispute resolution.

**ORDER - 33**

# ORDER

Based on the foregoing, and being fully advised in the premises, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 20) is **GRANTED in part and DENIED in part.**

Summary Judgment is **GRANTED** with respect to Plaintiff White's claims for a hostile work environment, claims pursuant to the ADEA, FLSA and negligent or intentional infliction of emotional distress. Summary Judgment is **DENIED** with respect to Plaintiff White's claims of sex discrimination and retaliation.

Summary Judgment is **GRANTED** with respect to Stringer's claims for hostile work environment, claims pursuant to the FLMA, FLSA and negligent or intentional infliction of emotional distress. Summary Judgment is **DENIED** with respect to Plaintiff Stringer's claims of sex discrimination, retaliation and violations of the ADA.

The Court will set this matter for a jury trial on **Tuesday, August 16, 2016 at 9:30 a.m. at the Federal Courthouse in Boise, Idaho**. All pretrial filings set forth in the Scheduling Order shall be calculated based on this new trial date.

Additionally, the Court directs the parties to contact Keith Bryan the District

of Idaho's ADR Coordinator (208-334-9067) if they wish to participate in a

Settlement Conference with United States Magistrate Judge Mikel H. Williams.

SO ORDERED.


DATED: March 31, 2016

Edward J. Lodge
United States District Judge

**ORDER - 35**